Filed 8/28/13  P. v. White CA4/2

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E055529 |
| v. | (Super.Ct.No. RIF10004243) |
| CRAIG KEYON WHITE, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County.  Elisabeth Sichel and Michael B. Donner, Judges.  Affirmed.

Suzanne G. Wrubel, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Melissa Mandel and A. Natasha Cortina, Deputy Attorneys General, for Plaintiff and Respondent.

1

A jury found defendant and appellant Craig Keyon White (defendant) guilty of four counts of first degree robbery (Pen. Code, §§ 211, 212.5, subd. (a)),[1] two counts of attempted robbery (§§ 644, 211) and one count of first degree burglary (§ 459). After defendant admitted the allegations that he had two strike priors within the meaning of the three strikes law (§§ 667, subds. (c), (e)(2)(A), 1170.12, subd. (c)(2)(A)) and that he had served a prior term in prison (§ 667.5, subd. (b)), the trial court sentenced him under the three strikes law to serve four consecutive terms of 25 years to life in state in prison.[2]

In this appeal defendant challenges the jury's guilty verdicts on the ground, first, that by sustaining the prosecutor's objection to a statement defendant's attorney made during closing argument, the trial court violated various rights guaranteed to defendant under the federal constitution, including his right to a fair trial and his right to the effective assistance of counsel. Next, defendant contends the trial court abused its discretion by denying defendant's so-called *Pitchess*[3] motion. Finally, defendant contends the trial court abused its discretion by denying defendant's oral motion for release of juror identifying information.

We conclude defendant's claims are meritless. Therefore, we will affirm the judgment.

---

[1] All statutory references are to the Penal Code unless indicated otherwise.

[2] The trial court sentenced defendant to serve one year in state prison on the section 667.5, subdivision (b), prior prison term, and then struck that sentence.

[3] *Pitchess v. Superior Court* (1974) 11 Cal.3d 531 (*Pitchess*).

**FACTS**

What happened in this case is undisputed—four men, one of whom was armed with a chrome handgun, entered a house and initially robbed four people, taking items from them personally and also taking things found in the house, including a Sony PlayStation®3. Defendant was arrested three weeks after the robbery, when he tried to pawn the PlayStation®3. The only issue at trial was whether defendant was one of the robbers.

The four initial robbery victims were Dennis Estevez and Arian Valdez,[4] who lived together in the house where the robbery occurred, Patricia Alvarado, who is Estevez's girlfriend, and Marcus Harden, a friend of Estevez and Valdez. During the robbery, Tyler Gonzalez and Jose Reyes, who are both friends of Valdez and Estevez, came to the house. Before they could be warned away, Gonzalez and Reyes were directed into the house by one of the robbers, later identified as defendant, who was holding a gun to the back of Estevez's head as Estevez stood at the open door. Defendant directed them both to lie down on the floor with the three other victims, all of whom had been directed to cover their heads and not look at defendant or the other robbers. When the robbers' attention was diverted, Reyes got up and ran from the house to a convenience store where he convinced the clerk to call the police.

---

[4] Valdez also apparently was referred to at trial as Arian Ibarra.

The robbers left the house before the police arrived, but after taking three of the remaining five victims into the bathroom and directing them to count to 100. After they determined the robbers had left the house, one of the victims ran next door and also called 911.

Estevez, Valdez, Harden, and Alvarado each identified defendant from a photographic lineup prepared by Deputy Jonathan Bodnar. Although only some of them identified defendant as the gunman, they all said defendant was one of the robbers.

To support his defense of misidentification, defendant presented an alibi (that he had been at the hospital on the night of the robbery visiting his recently born son, then at his mother's house for the rest of the night and until the next morning) and the testimony of an expert on memory and suggestibility, which involves the influence that new information obtained after an event has on one's memory of that event. The expert, Mitchell Eisen, who has a doctorate in psychology, and is the director of the graduate program in forensic psychology at California State University, Los Angeles, testified about the many things that affect the reliability of memory and that influence the outcome of a lineup. Among other things, Dr. Eisen testified, when the interviewer knows which photo is that of the suspect, the interviewer can inadvertently or unconsciously affect the outcome of the photographic lineup; the viewer of a photographic lineup brings certain expectations to the process including the expectation that one of the photographs will be of the suspect and that the interviewer expects the viewer to identify someone; identification based on the witness's actual memory typically happens quickly, within 10 to 12 seconds after seeing a lineup; once a witness identifies someone as the suspect,

4

the witness incorporates that image into his or her actual memory of the event and then reconstructs the event around the person identified; and that the most accurate memories of an event are those recounted right after the event.

Additional facts pertinent to the issues defendant raises in this appeal will be recounted below.

**DISCUSSION**

**1.**

**VIOLATION OF DEFENDANT'S VARIOUS CONSTITUTIONAL RIGHTS INCLUDING THE RIGHT TO PRESENT A DEFENSE**

During her closing argument, defense counsel stated, "And if you believe that Miss Alvarado, Mr. Estevez, and Mr. Valdez sharing a household together, all of these individuals being friends, go through this terrifying traumatic incident and never speak a word of it . . . ." The prosecutor interrupted objecting that the argument was based on speculation. The trial court sustained that objection. Defendant contends the trial court effectively precluded him from arguing, due to the close relationship between the three victims, that it was likely they had talked with each other about the robbery and the criminal investigation. In other words, defendant contends the trial court precluded him from attacking the credibility of the victims' testimony regarding what happened during the robbery and the validity of their ability to independently identify defendant as one of the robbers.

5

The right to present a closing argument is not in dispute in this appeal. (See *Herring v. New York* (1975) 422 U.S. 853, 858-860.) What is disputed is defendant's characterization of the effect of the trial court's ruling. That characterization is inaccurate. Therefore, even if the trial court's ruling was incorrect it did not affect defendant's ability to present his defense of mistaken identification.

The record discloses that defense counsel did not miss a beat. Despite the prosecutor's objection and the trial court's ruling, defense counsel completed her argument that it was "unreasonable" for the jury to believe the victims had not talked with each other about the robbery. Before the prosecutor asserted the speculation objection, defense counsel had pointed out that one of the victims, Tyler Gonzalez, not only "admitted that he wouldn't be able to ID anybody from the get go. . . . But even more importantly, Mr. Gonzales [*sic*] told us something else: He told us how many times these witnesses had talked to each other." As defense counsel stated, Tyler Gonzalez "said something like he had been asked so many questions over and over again, he was confusing the details himself. He couldn't remember what he personally remembered anymore versus what someone else had told him."

Defense counsel argued at great length and in detail why the victims' identifications of defendant from a photo lineup were tainted and consequently unreliable. Not only did defense counsel point out that the victims presumably had talked with each other, but also that before they were shown the lineups, Arian Valdez and Dennis Estevez had read the police reports, "[p]olice reports that include[d] witness statements." Defense counsel made similar arguments regarding each of the victims. For

6

example, he argued that Marcus Harden, as well as Valdez and Estevez, knew defendant was the pawnshop suspect at the time Deputy Bodnar showed him the photo lineup that included defendant's photo.

With respect to Patricia Alvarado, defense counsel argued Deputy Bodnar must have shown her defendant's photo before she identified him from the photo lineup. Otherwise, it was just too coincidental that Deputy Bodnar had a photograph of defendant smiling and revealing his crooked teeth, and produced that photo when Miss Alvarado said she would be more confident of her identification if she could see the teeth of the person she had just identified.

In addition to pointing out the defects and inconsistencies in the testimony of the victims, defense counsel correlated those defects and deficiencies to Dr. Eisen's testimony. For example, defense counsel reminded the jurors that Dr. Eisen had talked about contamination, which results when a witness is exposed to other people's versions of an event. Defense counsel also reminded the jurors that Dr. Eisen had explained the concept of expectancy and how it affects the validity of identification from a photographic lineup: the viewer knows he or she is expected to identify someone and that expectancy can result in an incorrect identification.

We will not recount anymore details of defense counsel's closing argument. From the noted examples, and our review of the record, we are persuaded defendant was able to fully and completely present his defense of misidentification both in cross-examination of witnesses and in closing argument. Because defendant's initial assertion is incorrect, we will not address the remainder of his argument. In short, by sustaining the prosecution's

7

objection that defense counsel's argument was based on speculation, defendant was not precluded from presenting his defense or otherwise adversely affected and therefore if the trial court erred the error was harmless. (*People v. Watson* (1956) 46 Cal.2d 818, 836.)

**2.**

**DENIAL OF DEFENDANT'S *PITCHESS* MOTION**

Defendant filed a motion for discovery of the personnel records of Riverside County Sheriff's Deputy Bodnar, the deputy who prepared the photographic lineups and showed those lineups to the robbery victims. Defendant asserted in his motion that the deputy's personnel records were discoverable under Evidence Code section 1043 et seq., which codifies the Supreme Court decision in *Pitchess.* The trial court denied defendant's motion after finding defendant had not made the required showing.

Defendant contends in this appeal that he established the required plausible factual scenario, which in turn triggered the trial court's obligation to conduct an in camera review of the deputy's personnel file to determine if it contains material relevant to defendant's claim. We disagree with defendant's assertion.

The pertinent legal principles are well settled. A criminal defendant is entitled to discovery of a police officer's confidential personnel records if those files contain information that is potentially relevant to the defense. (*Pitchess*, *supra*, 11 Cal.3d at pp. 537-538; Evid. Code, §§ 1043-1045.) To obtain discovery, the defendant must file a motion, supported by affidavits "showing good cause for the discovery or disclosure sought, setting forth the materiality thereof to the subject matter involved in the pending litigation." (Evid. Code, § 1043, subd. (b)(3).) If good cause is shown, the trial court

then reviews the records in camera to determine if any of them are relevant to the proposed defense. (Evid. Code, § 1045, subd. (b).)

The good cause showing that triggers the trial court's in-chambers review is "relatively low." (*City of Santa Cruz v. Municipal Court* (1989) 49 Cal.3d 74, 83.) The defendant must present a specific factual scenario of officer misconduct that is plausible, i.e., one that could or might have occurred. (*Warrick v. Superior Court* (2005) 35 Cal.4th 1011, 1018-1019 (*Warrick*); see also *California Highway Patrol v. Superior Court* (2000) 84 Cal.App.4th 1010, 1017.) The defendant must also demonstrate how the discovery would support the defense or how it would impeach the officer's version of events. Because the information discoverable under a *Pitchess* motion is limited to "instances of officer misconduct related to the misconduct asserted by the defendant," (*Warrick*, *supra*, 35 Cal.4th at p. 1021) the defendant must also specifically describe that misconduct. On appeal we review a trial court's ruling on a *Pitchess* motion for abuse of discretion. (*Alford v. Superior Court* (2003) 29 Cal.4th 1033, 1039.)

In this case, defendant's trial attorney offered the following factual scenario to support defendant's *Pitchess* motion: Defendant was at his mother's house, not at the scene of the crime, on the night in question; defendant did not participate in the crimes, nor did he have any knowledge that the Sony PlayStation®3 was stolen property; Deputy Bodnar assumed defendant had participated in the robberies once the deputy learned defendant had pawned the stolen Sony PlayStation®3; Deputy Bodnar's "overzealousness to turn [defendant] into a robbery suspect caused [defendant] to be wrongfully identified by witnesses who were unable to identify any suspect, or otherwise would not have

9

identified [defendant] as a suspect"; Deputy Bodnar "falsified his reports regarding the conversations and conduct of himself and of the witnesses surrounding alleged identifications of [defendant] as a suspect"; Bodnar stated in his reports that he had recorded the witness interviews and booked those recordings into evidence, but then he destroyed those recordings in an effort to prevent his misconduct from being discovered; and the "Riverside County District Attorney's Office and Riverside County Sheriff's Department have both had reason to question [Deputy] Bodnar's veracity and conduct as an officer in this and other cases, thus prompting investigations from both agencies."  In a supplemental declaration, defense counsel acknowledged that Deputy Bodnar's recorded witness interviews had been located but that his reports of what the witnesses said when they identified defendant in the photo lineups conflicted with the recorded interviews.

In short, defendant's factual scenario is that he was not one of the robbers; he was at his mother's house on the night of the robbery; Deputy Bodnar must have done something untoward in connection with the photo lineups, such as tampering with the evidence or unduly influencing the victims, which explains why the victims identified defendant; and the deputy destroyed the recordings of those interviews in order to cover up his misconduct.  That is a specific factual scenario.  The remaining issue is whether that scenario is plausible.

To determine plausibility, i.e., whether the scenario could have or might have occurred, we look to the evidence defendant submitted to support his claim.  Defendant's factual scenario was plausible only until Deputy Bodnar located the recordings of his interviews with the victims.  Once the recordings were located, and defense counsel

10

submitted transcripts of those recordings to the court to support defendant's motion, the plausibility of defendant's factual scenario turned on the content of the transcripts which showed what actually occurred. The trial court found defendant's factual scenario was not plausible because the police reports and transcribed witness interviews of what actually happened contradicted defendant's scenario that Deputy Bodnar had somehow influenced their selection of defendant from the photo lineup.

We agree with the trial court that the evidence does not support, and in fact refutes, defendant's scenario that Deputy Bodnar improperly influenced the victims' identification of defendant from the photo lineups. In arguing otherwise, defendant cites discrepancies between the recordings of the interviews and Deputy Bodnar's written reports. For example, defendant notes Deputy Bodnar's police report does not disclose that when Valdez a.k.a. Ibarra selected defendant's photograph from the so-called six-pack photo lineup he said, "This guy looks closer, but I don't think it was him. The other guy looked older."[5] That fact does not establish defendant's claim that Deputy Bodnar influenced Ibarra to identify defendant from the photo lineup. It only shows Ibarra was less than 100 percent certain about that identification, a fact Deputy Bodnar included in his report when he stated Ibarra indicated he was 50 percent sure defendant entered the house and committed the robbery.

---

[5] The transcript of the recorded interview shows Ibarra also stated, "the whole face structure, very similar. I mean it's been over a month, you know." After Deputy Bodnar said, "Mm-hm," Ibarra continued, "So, it's pretty hard for me to tell, but number six [defendant's photo] looks like he has that, you know, facial features, but . . . ."

Similarly, the transcript of Deputy Bodnar's interview of Dennis Estevez does not support defendant's assertion that the deputy prompted Estevez to pick defendant's photograph. The transcript discloses that the deputy asked, "Okay. Is there anyone that looks similar, 'cause I see you—it kinda looks like you keep paying attention to one photograph to me. You keep looking back at the one." Estevez identified a photograph ("Maybe this one with the du-rag") and indicated he was 50 percent positive about the identification.

We will not address each witness identification because defendant has demonstrated only that the recordings of the interviews differ in some respects from some of Deputy Bodnar's reports; they do not show that he improperly influenced any of the victims into selecting defendant's photograph from the photo lineups. In short, we know from the evidence what actually occurred when Deputy Bodnar interviewed each of the witnesses, and that evidence shows defendant's scenario is not plausible. Therefore, the trial court did not abuse its discretion when it denied defendant's *Pitchess* motion based on defendant's failure to establish good cause for the requested discovery.

### 3.

### DISCLOSURE OF JUROR INFORMATION

Defendant filed a motion for new trial in which he asserted jury misconduct, among other things. According to the declaration of his attorney submitted in support of the new trial motion, after trial concluded and the trial court discharged the jury, about two-thirds of the jury panel stayed and discussed the case with the attorneys; during that discussion the jurors "collectively stated," among other things, that when the jurors were

unable to reach verdicts after several days of deliberations, they discussed their observations that throughout the trial, defense counsel would talk to defendant after cross-examining prosecution witnesses; "[t]he jurors . . . opined that discussion between [defense counsel] and the defendant would have been unnecessary if the defendant had not been one of the robbers"; and after the jury's discussion, at least one juror changed her verdict from not guilty to guilty.

In its opposition the prosecution asserted, first, that defense counsel's declaration was hearsay to the extent it purported to recount what a juror had said, and in any event, defense counsel's version of what the juror said was wrong. According to the prosecutor, who was present and also talked with the jurors after they had been discharged, the attorneys had asked for constructive criticism. One juror responded that she did not think it was wise, if they were claiming defendant was not there, for defense counsel to ask defendant after each witness testified whether there was anything else defense counsel needed to ask. That juror thought it "seemed strange if the defendant was claiming he wasn't there." According to the prosecutor, the juror did not say they discussed this during their deliberations and she did not say that they changed their verdicts as a result.

The trial court heard defendant's new trial motion in conjunction with defendant's sentencing hearing. At that hearing, the trial court asked defense counsel to address the issue of whether her declaration was inadmissible hearsay. Defense counsel responded, "Well, your Honor, if the Court feels as though it needs more factual information, then I would request to unseal the juror information so that a questionnaire or something of the sort could be sent to the jurors so that the Court can receive the information that it's

13

seeking." The trial court denied that request and ultimately denied defendant's new trial motion.

On appeal, defendant characterizes the statement quoted above as a motion under Code of Civil Procedure section 237 for disclosure of juror identifying information. We do not agree, but we will not belabor the point, because even if we were to agree, defendant has not demonstrated error.

After the jury's verdict is recorded in a criminal case, the personal identifying information about the jurors who served on the trial is sealed. (Code Civ. Proc., § 237, subd. (a)(2).) A defendant or the defendant's attorney may request access to that information in order to "communicate with jurors for the purpose of developing a motion for new trial or any other lawful purpose." (Code Civ. Proc., § 206, subd. (g).) The procedure for obtaining that information is set out in Code of Civil Procedure section 237, subdivision (b): "Any person may petition the court for access to these records. The petition shall be supported by a declaration that includes facts sufficient to establish good cause for the release of the juror's personal identifying information. The court shall set the matter for hearing if the petition and supporting declaration establish a prima facie showing of good cause for the release of the personal juror identifying information . . . ." On appeal, we review a trial court's denial of a petition to disclose juror identifying information for abuse of discretion. (*People v. Carrasco* (2008) 163 Cal.App.4th 978, 991.)

14

The trial court denied defendant's request for disclosure of juror identifying information in part because defendant had not been diligent in making his request. As the trial court observed, defendant had an opportunity to complete his investigation in order to file a new trial motion. The fact defense counsel waited until the hearing on that motion to request disclosure of juror information suggests that information would not aid defendant in developing his juror misconduct claim.

Defense counsel learned of the purported jury misconduct on the last day of trial, when she spoke with the jurors outside the courtroom. Despite that knowledge, defense counsel did not immediately report the purported misconduct to the trial court, nor did she ask for contact information from the juror who reputedly revealed the misconduct. Despite the obvious differences, the circumstances here are equivalent to those in *People v. Carrasco*, in which the court stated, in holding the trial court did not abuse its discretion in denying disclosure of juror identifying information, "What strikes us even more is that defense counsel learned about the claimed juror misconduct during the trial, before a verdict was entered, and had an opportunity to try to rectify any problem she perceived. Defense counsel could have proposed an additional line of inquiry to the trial court if she believed jury misconduct had occurred which the court was overlooking. She did not." (*People v. Carrasco*, *supra*, 163 Cal.App.4th at p. 991.)

15

Because defense counsel did not take any action with respect to the jury's purported misconduct other than cite it in a motion for new trial, we suspect the prosecutor's version more accurately describes what happened when the attorneys talked with the jurors.  In any event, we conclude the trial court did not abuse its discretion by denying defendant's request to disclose identifying information about the trial jurors.

## DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

McKINSTER
J.

We concur:

HOLLENHORST
Acting P. J.

MILLER
J.